FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

03 SEP 16 AM 10: 29

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| KIMBERLY BEAVERS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 02-PT-2380-M |
| | ) | |
| M.C. PRODUCTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED

SEP 16 2003

**MEMORANDUM OPINION**

This cause comes on to be heard upon defendant's Motion for Summary Judgment, filed

on July 11, 2003.

**FACTS AND PROCEDURAL HISTORY**

Defendant M.C. Products, Inc. ("MC"), f/k/a MillCast, Inc. ("MillCast"), located in Pell

City, Alabama, manufactures architectural columns used in building and construction.[1]  Plaintiff

Kimberly Beavers ("Beavers") began working for MC as a sander in the cap and base

department on or around September 15, 2000.  *See* Def. Ex. 1, p. 80.  MC terminated Beavers in

August 2001, and her layoff papers are dated August 13, 2001.[2]  Beavers contends that she was

laid off from the company because "she engaged in protected activity by opposing sexual

harassment and sex discrimination."  *See* Compl. at ¶ 20.  In this lawsuit, brought pursuant to

Title VII, 42 U.S.C. § 1981a, and state law, Beavers alleges three causes of action: sexual

harassment (hostile work environment), retaliation, and negligent and/or wanton hiring, training,

---

[1] On March 28, 2003, MillCast moved to substitute M.C. Products, Inc. as the proper named defendant. This Court granted that motion on April 2, 2003. This Memorandum Opinion refers to defendant as MC rather than MillCast.

[2] Beavers testifies that August 13, 2001 was the last day she came to work at MC, *see* Def. Ex. 1 at 83, while McCoy (the Plant Manager) testified that her last day was August 10, 2001. *See* Pl. Ex. 9 at 128-129.

*41*

supervision, and/or retention.[3]

FACTS UNDERLYING BEAVERS' CLAIMS[4]

## I.   CLAIM ONE: HOSTILE WORK ENVIRONMENT - SEXUAL HARASSMENT

### A. Incident One - July 24, 2001

Beavers began working for MC in September 2000 in the cap and base department, reporting to Cathy Riggs. On May 21, 2001, Ken Shelton ("Shelton") became Beavers's supervisor, and she reported to him. As Beavers's supervisor, Shelton had the power to assign vacation days, discipline employees, and terminate employees.[5] Shelton lacked hiring power. As her supervisor, Shelton knew Beavers's vacation schedule and how many vacation days she had left.

On July 24, 2001, Beavers alleges, Shelton visited Beavers's booth, told her he was going to take vacation soon, and asked her to take a day off with him. Beaver alleges that she told Shelton no, but Shelton told her to think about it and walked off. Then, Beavers alleges, Shelton returned, asked her if she had thought about his request, and she told him "no" again. According to Beavers, Shelton promised to alter her time card to reflect an extra personal day if she took the day off with him (Beavers had no more vacation days left). MC "denies there is any supporting or corroborating testimony" for this alleged incident from sources other than Beavers.

---

[3] In addition to damages, Beavers seeks a declaratory judgment, an injunction, costs, attorney's fees, and expenses. *See* Compl. at § V.

[4] In MC's response to plaintiff's summary judgment opposition, MC responds to certain evidence by "admit[ting] there is a source for this evidence." For purposes of ruling on defendant's summary judgment motion, this court treats those particular "facts" as undisputed. Furthermore, for some unknown reason, defendant repeatedly argues that the testimony of plaintiff is not corroborated. This court will note these arguments but is not aware of any significance they have at this stage, and it will not repeat its continued questions as to the present significance of these arguments.

[5] Shelton testified that the right to lay Beavers off was "[n]ot entirely my right." *See* Pl. Ex. 10 at 23.

2

### B. Incident Two - July 26, 2001

On Thursday, July 26, 2001, Beavers alleges, she was at her work station when Shelton approached and told her he still wanted to sleep with her. MC disputes the use of the word "still" in this allegation, since Beavers's deposition testimony referenced July 26, 2001 as "the first time [Shelton] ever told [Beavers] specifically he wanted to sleep with [her]." *See* Def. Ex. 2 at 159. According to Beavers, she told Shelton she was not interested. Beavers then alleges that Shelton said the following things: he knew he could make her feel good, he wanted to perform oral sex on her because he had never done it before, he would stick his tongue inside of her and make her feel good, and he knew that's what she needed. Beavers states that she told Shelton she did not want to hear that and to leave her alone. Beavers characterizes Shelton's proximity at the time of this alleged conversation as "so close to her she felt his breath on her face." Around this same date, Beavers asserts, Shelton told Beavers her breasts looked good, her butt was getting big, and her butt looked good in her pants. Beavers adds that Shelton told her he could stick his penis inside of her and make her feel good.

MC denies "any supporting or corroborating testimony" for this alleged second incident. Noting discrepancies between Beavers' allegations and her deposition testimony, MC points out that Beavers initially testified that Shelton mentioned sex on July 24, 2001, but later testified that Shelton "didn't say anything about his penis or about sex" on that date. *See* Def. Ex. 1, at 148, 155. Beavers replies that uncertainty about the exact date of Shelton's remarks does not mean there is no source for this evidence and contends that a jury trial, not summary judgment, is the place for MC's

3

credibility attack.[6]

### C. Incident Three - July 31, 2001

Randy McCoy ("McCoy") was plant manager as of July 31, 2001.  On this day, Beavers alleges, Shelton asked her if she had thought about what he had said.  Then, Beavers asserts, she told Shelton she had already expressed no interest in having anything to do with him, and Shelton looked at Beavers and walked away.  MC denies "any supporting or corroborating testimony" for this alleged third incident.

### D. Incident Four - August 1, 2001 - Evidence Purporting to Create a Reasonable Inference that on August 1, 2001, Shelton Continued to Sexually Harass Beavers and When She Rejected Him, He Took a Tangible Employment Action against Her By Laying Her Off[7]

Beavers alleges that on August 1, 2001, Shelton spoke softly in her ear that he still wanted to have sex with her and would like her to come by his house later that day.  Beavers states that she told Shelton she was not interested and wanted to be left alone.  MC denies "any supporting or corroborating testimony"for this alleged fourth incident.

---

[6] This court confirms that Beavers testified that Shelton mentioned sex on July 24, 2001, *see* Def. Ex. 1 at 147-149, but later indicated in her deposition that July 26, 2001was the first time Shelton mentioned sex and his penis. *See* Def. Ex. 1 at 155, 159.

[7] MC criticizes the different reasons Beavers gives for her termination.  Beavers's opposition to summary judgment causally links her refusal of Shelton's sexual advances to Shelton's "tangible employment action," i.e., her initial layoff on August 1, 2001.  Both Beavers's complaint and deposition testimony state "[MC] retaliated against the plaintiff because she engaged in protected activity by opposing sexual harassment and sex discrimination." *See* Compl. at ¶ 20; Def. Ex. 1 at 225. According to MC, this court should not consider evidence relating to a *quid pro quo* claim, since Beavers failed to present this claim in her opposition to summary judgment.  MC notes that the court does not have to "distill every potential argument that could be made based upon the materials before it on summary judgment." *See Resolution Trust Corp. v. Dunbar Corp.,* 43 F.3d 587, 598-99 (11th Cir. 1995).

In response, Beavers asserts the following: MC did not seek summary judgment on a *quid pro quo* claim; Shelton's termination of Beavers after she rejected him shows he took a "tangible employment action" against Beavers, which prohibits MC from asserting an affirmative defense; Beavers is not claiming that Shelton directly told her that if she did not have sex with him he would fire her (a true *quid pro quo* claim); "Beavers's implicit *quid pro quo* claim is part of her sexual harassment claim in that the harassing supervisor took a tangible employment action against her"; and Beavers has not pled a separate *quid pro quo* claim.

On August 1, 2001, Beavers asserts, Shelton allegedly returned to Beavers's work station an hour after she refused his sexual request.  MC denies "any supporting or corroborating testimony."  The parties do not dispute that, on August 1, 2001, Shelton informed Beavers that she was being laid off.  When Beavers asked why she was being laid off, Shelton told her that Mark, the manager or owner, told him he must lay Beavers off.  Shelton explained that there was not enough work in the cap and base department to keep her busy.  Shelton told Beavers she could work the rest of the week and pick up a layoff paper from McCoy.  In McCoy's deposition, McCoy similarly testified that, around July 31, 2001, he told Shelton that Shelton needed to lay somebody off out of the cap and base department.  McCoy first learned that Shelton had selected Beavers for layoff on August 1, 2001.

Beavers then highlights alleged inconsistencies between McCoy's deposition and MC's EEOC position statement.[8]  While McCoy testified, "I didn't have a discussion with Mr. Shelton to lay off any particular person.  He chose to lay off Ms. Beavers" *(see* Pl. Ex. 9, McCoy deposition at 199), MC's EEOC Position Statement indicated that on August 6th or 7th:

> Mr. Shelton and Mr. McCoy discussed laying off the charging party . . . .  Although Mr. McCoy had heard that Ms. Beavers was disgruntled about Mr. Shelton warning her about tardiness and work performance, and that she wanted to be laid off to collect unemployment, *he determined to lay her off* because of the company's work needs and her performance, not because of anything she had heard she said to others. (Emphasis added).

Furthermore, the EEOC position statement indicated that Shelton and McCoy had a meeting on

---

[8] In her opposition to summary judgment, Beavers relies upon the following documents: two "Notice of Employee Terminations" dated August 13, 2001 (one signed by McCoy showing "layoff/lack of work" as a reason to terminate Beavers; the other signed by McCoy and HR Manager Leverton indicated both lack of work and bad work habits as reasons for terminating Beavers on August 13, 2001); an Employee Warning Notice dated June 18, 2001, jointly signed by Shelton and Britt Russell, citing Beavers for absenteeism, Avon sales, and reading newspapers and further stating "Employee refuses to sign"; two nearly identical typed notes dated August 7, 2001, jointly signed by McCoy and Shelton; two separate Investigative Notes sheets dated December 5, 2001, signed by McCoy and Shelton, respectively; and MC's EEOC position statement dated June 17, 2002.

August 6th or 7th to discuss terminating Beavers, while McCoy stated Shelton made the layoff decision earlier in the week.

McCoy testified that Shelton informed him that Beavers did not mind being laid off so she could draw unemployment payments, and McCoy told Shelton to lay off whomever he wished. On the other hand, Beavers claims, she never told anyone she wanted to or did not care about being laid off because she could draw unemployment payments, which MC denies for lack of "supporting or corroborating testimony." Shelton's testimony on this issue reads:

> "*Q: So she told you she didn't care about being laid off?*
> A: That was her words.
> *Q: Did she ever volunteer for layoff?*
> A: No, not --
> *Q: So she didn't say, " I want to be laid off so I can draw my unemployment?"*
> A: No, not with me, she didn't.
> *Q: Did you ever hear that she said that? Did you ever tell anybody she said that?*
> A: No.  She just expressed an attitude that indicated she just didn't care.
> *Q: About her work; right?*
> A: Well, I don't know if it was about the work but it was just – I thought it was just an ugly attitude to have, you know, about her job – on a job that you are working.
> *Q: Did she ever tell you that, "You can lay me off.  I don't care."*
> A: No, nothing at that particular time.
> *Q: But on that occasion, did she say, "I don't care if you lay me off?"*
> A: No, she didn't say me.  She said they?
> *Q: What now?*
> A: She said, "They can lay me off anytime they want to.  I don't care."
> *Q: And did you tell Randy that?*
> A: I told Randy about her attitude and what she said.

*See* Pl. Ex. 10 at 48-49.

### E. Beavers's Reports of Sexual Harassment to McCoy, Plant Manager

#### 1. August 2, 2001[9] - Report of Sexual Harassment

---

[9] Beavers cites August 2 (Thursday) as the date of her first conversation with McCoy about Shelton's decision to lay her off, while McCoy cites August 3 (Friday) as the date of the first conversation.  Beavers and McCoy give different accounts of that conversation, as mentioned below.

On Thursday, August 2, 2001, Douglas Embry ("Embry"), a coworker, asked Beavers why she volunteered for layoff.  When Beavers denied requesting a layoff, Embry told her the information came from McCoy and Shelton.  Beavers then approached McCoy.  She asked McCoy if Shelton had indicated that she wanted to be laid off, and McCoy said yes.  Beavers and McCoy do not dispute that Beavers informed McCoy she had not asked to be laid off, to which McCoy responded "That seems sort of strange that you want to be laid off."[10]  *See* Pl. Ex. 9 at 107.

On August 2, 2003, Beavers further alleges, she informed McCoy pursuant to company policy of Shelton's sexual advances and her refusals.  MC denies "supporting or corroborating testimony."[11]  However, McCoy testified, as of August 3, 2003, Beavers had not reported Shelton's alleged sexual harassment but had possibly mentioned she could not work with Shelton.  Pl. Ex. 9 at 112.  McCoy did not ask Beavers why she could not work with Shelton.

According to Beavers, McCoy told her to work until the following Monday (August 6th), when Shelton returned from vacation and they could straighten things out with him.  MC denies any "supporting or corroborating testimony."[12]

## 2. **August 6, 2001 - Report of Sexual Harassment and Failure to Investigate**[13]

Regarding the events of August 6, 2001, the parties agree to the following: McCoy told

---

[10] Both McCoy and Shelton signed the following statement on August 7, 2001: "[Beavers] wanted to be laid off to draw her unemployment."  *See* Pl. Ex. 9.  MC's EEOC position statement notes that McCoy's determination to lay her off was not based on hearing that she did not care about being laid off.

[11] MC admits that company policy designates McCoy (plant manager) as the proper person to receive complaints of sexual harassment but denies that any company policy supports Beavers's delay in reporting Shelton's misconduct until she learned of her layoff.

[12] This court notes that MC's denial here contradicts MC's admission of the statement "McCoy wanted Beavers to come in on Monday to straighten out the misunderstanding."

[13] In light of the parties' disagreement about what transpired August 6, 2001 between Beavers, McCoy, and Shelton, this court has attempted to summarize in detail the parties' contentions even if repetitive.

Beavers that Shelton was supposed to arrange a morning meeting with her; when Shelton never appeared, Beavers visited McCoy after lunch and told him she was ready for the meeting; McCoy told Beavers to go upstairs while he called Shelton, and Beavers waited for them upstairs; when McCoy and Shelton arrived, McCoy told Shelton the meeting was called to discuss Shelton's assertions that Beavers wanted to be laid off; McCoy asked Beavers if this was true, and Beavers said she had never asked to be laid off.

At this point, Beavers's and MC's accounts of August 6, 2001 diverge.  Beavers contends that she again reported Shelton's unwanted sexual advances to McCoy.[14]  Beavers alleges that she told McCoy her repeated refusals of Shelton's sexual advances explained Shelton's motivation for misinforming McCoy that she wanted to be laid off.  MC denies "supporting or corroborating testimony" from sources other than Beavers.

Then, Beavers alleges, she asked McCoy if he thought she would be saying that if it was not true, and McCoy agreed that it did sound strange that she wanted to take a layoff.  Beavers further alleges that she told McCoy she wanted to file sexual harassment charges against Shelton and McCoy told her that was a strong allegation to make.[15]  Furthermore, Beavers alleges, McCoy told Beavers that she needed to try to get along with Shelton and that he would investigate if Beavers would go back to the sanding area and work.  Beavers states that she then told McCoy she could not work with Shelton, so McCoy said he would move her to the re-work department under Amy Jordan

---

[14] As mentioned earlier, Beavers alleges that she first reported this on August 2, 2001.

[15] Shelton testified that he overheard Beavers mention filing a sexual harassment suit against him and tell McCoy that Shelton was trying to have sex with her.  Shelton testified that he then walked out of the meeting. Beavers notes that Shelton's deposition does not mention that Shelton spoke to McCoy at this point or denied plaintiff's charges during that meeting.  MC objects to this on the basis that "Shelton was under no obligation to 'mention' anything that was not asked."  It would, however, likely be admissible.

for the rest of the week until he investigated and got back with Beavers. MC denies any "supporting or corroborating testimony" from sources other than Beavers for this alleged conversation.[16]

McCoy recounts a different version of the events of August 6, 2001. McCoy testified that August 6th was the first time Beavers brought up allegations of Shelton's sexual harassment. When Beavers was in his office, McCoy testified, Beavers was "just yapping," fussing about Shelton, not making sense, and saying she had two kids and needed her job. McCoy further stated: "You know how women are." McCoy further testified that after Beavers said she wanted to file sexual harassment charges against Beavers, he cautioned that "those are very strong allegations, Ms. Beavers. If they are true, I want you to be honest, you know." Less than thirty minutes later, McCoy alleged, Beavers retracted her allegations against Shelton. McCoy testified that he then told Beavers not to say things like that if she did not mean them, and Beavers went back to re-work.

Beavers replies that she never recanted or denied the truth of her sexual harassment allegations to McCoy or anyone else. MC denies any "supporting or corroborating testimony" from

---

[16] While Beavers's testimony indicated that McCoy transferred her to re-work on August 6, 2001 (Def. Ex. 1 at 211), McCoy's deposition indicated he decided to transfer her to re-work on Friday, August 3, 2001 (Pl. Ex 9 at 111, 127). Pertinent parts of McCoy's deposition are as follows:

A: On Friday [August 3] I told her, "As soon as Ken gets back that we would see about this." So Friday I told her to go on back to work, go to re-work.
. . .

A: [Beavers] was supposed to have been laid off on the 1st – on the 1st or the 31st, one of those days. But when she come to me – and she was told she could work until Friday.
Q: Friday, the 3rd?
A: The 3rd, and that's when she come to me on Friday, plus I had got a big order in in re-works. So I said, "Well, Kim, I can use you in re-work for a little while."

sources other than Beavers.  Significantly, Beavers alleges, discrepancies exist between McCoy's different accounts of her alleged retraction: while McCoy's deposition stated that Beavers never left his office in the approximately fifteen minutes between making the allegations and retracting them, his signed August 7, 2001 statement placed Beavers's retraction as occurring the next morning, when Beavers told McCoy she had made all of this up because she was mad at Shelton.[17]

No one disputes that McCoy never instructed Beavers to put her retraction in writing.  The only person who informed Leverton of Beavers' alleged retraction was McCoy, and Leverton did not verify McCoy's information with Beavers.  McCoy testified that he informed Mark Russell ("Russell") that Beavers first said she wanted to file sexual harassment charges against Shelton but then retracted her allegations.  *See* Pl. Ex. 9 at 254.  Although McCoy testified that Shelton was present when Beavers retracted, Shelton testified that he only learned of Beavers' retraction from McCoy and did not understand that it occurred during the same meeting where she made the allegations.[18]

While McCoy testified that he never asked Beavers what Shelton had done to make her claim sexual harassment (and did not know why he did not ask her), his signed August 7, 2001 statement claimed that Beavers raised the issue of Shelton's desire to vacation with her and his sexual advances.[19]  Shelton testified that Beavers told McCoy that Shelton wanted to have sex with her. Shelton further testified that McCoy informed him about Beavers's intentions to file a sexual

---

[17] Leverton, the human resource manager who typed the August 7, 2001 statement, also testified that McCoy told her that Beavers retracted the next morning.  *See* Pl. Ex. 12 at 20.

[18] MC denies this characterization of McCoy's testimony.

[19] Leverton, who typed the EEOC statement, testified that McCoy specifically told her that Shelton wanted to take a vacation with Beavers and was making advances towards her.

harassment claim, and when Shelton asked the basis, McCoy told Shelton it involved Shelton wanting Beavers to leave the company and have sex with him.

Shelton's August 7, 2001, signed statement reads as follows: "[Beavers] had already told several people in the plant that she wanted to cause [me] problems because she had been written up several time for tardies and long breaks."[20] However, both Shelton and McCoy have testified that they know of no MC employee who can corroborate that statement.

Both Shelton and McCoy testified to mistakes in the August 7, 2001 statement, and McCoy blamed the mistakes on Leverton. However, Leverton stated that each man gave the information verbally, then read and signed the final typed statement. When asked why he signed the erroneous document, Shelton could only blame it on lack of attention and seeing some truth in the statement. When asked what McCoy understood he was doing when he signed erroneous document, McCoy answered, "Getting some documents for the file."[21]

While McCoy's December 5, 2001 written statement indicates that McCoy told Beavers, "Ken was her supervisor and she needed to try to get along with him and stop making false accusations about him to other employees," Beavers asserts that McCoy denied this conversation

---

[20] Leverton, who typed their EEOC statements, testified that both Shelton and McCoy told Leverton that Beavers had already told several people in the plant that she wanted to cause Shelton problems.

[21] Beavers also lists inconsistencies between information provided in McCoy's and Shelton's depositions and MC's June 17, 2002 position statement to the EEOC. For instance, the position statement reads: "[Beavers] then stated to Mr. McCoy that Mr. Shelton had asked her to take a vacation day with her in order to have sex. Mr. Shelton was shocked as no such statement was ever made by him. He denied the statement. Mr. McCoy indicated that it was a serious statement and that Ms. Beavers should go back to work and he would look into the matter and get back to her . . . .Mr. McCoy reviewed the seriousness of the allegation with Mr. Shelton, confirmed the company's sexual harassment policy, and informed Mr. Shelton that any such conduct would not be tolerated in any form . . . . The next morning, the charging party came to see Mr. McCoy and recanted her prior statement to him alleging sexual harassment against Mr. Shelton, telling Mr. McCoy that the statement was not true." Contrary to this position statement, Mr. McCoy later testified that Beavers never mentioned anything about a vacation day, McCoy never discussed the seriousness of the allegations with Mr. Shelton, and Beavers recanted her allegations fifteen minutes after making them. This Court notes that MC objects to the "vague" and "ambiguous" way that Beavers has stated this information in her summary judgment opposition.

11

in his deposition, saying he didn't know why he signed such a statement.[22]  McCoy's December 5th

statement, Beavers notes, also states that Beavers told McCoy that she had made the allegations up

because Ken was always bossing her around, although McCoy later testified that Beavers never told

him that.[23]  Furthermore, Beavers contends, McCoy's EEOC statement reads "I know Kimberly has

approached several of the male employees regarding sexual favors and I told her this kind of

behavior would not be tolerated," whereas McCoy testified that this is incorrect and that he probably

didn't read the EEOC statement he signed.[24]  Additionally, Beavers notes, although Shelton's EEOC

statement reads, "If anything the advances were made on [Beavers's] part and not mine," Shelton

later admitted that Beavers made no advances towards him, and he never told anyone she made

advances.[25]

## II.  CLAIM TWO: RETALIATION[26]

### A.  Evidence Purporting to Create a Reasonable Inference that MC's "Lack of Work" Reason for Terminating Beavers is Not Legitimate and the Real Reason Is Retaliation

On Monday, August 13, 2003, Beavers arrived at the plant to attend an early meeting before

work.  After the meeting, Beavers alleges, McCoy called Beavers upstairs into his office and told

---

[22] MC deems Beavers's allegations a mischaracterization of McCoy's testimony and points out that McCoy simply attributes the conversation to a different time.

[23] MC denies the mischaracterization, submitting that "made up" and "untrue" are synonymous.

[24] Leverton again testified that she received the information from McCoy, typed it, and had him review and sign it.

[25] While MC "denies anything of the sort is found on any page cited by plaintiff, and defendant objects to any such characterization," Shelton's deposition appears to support Beavers's characterization.  See Pl. Ex. 10 at 75.

[26] The pertinent heading of Beavers's summary judgment opposition reads: "Defendant retaliated against Beavers by terminating her for non-legitimate reasons one week after she reported sexual harassment."

her she was laid off for lack of work.[27]  McCoy testified that the signed layoff sheet indicates that the true reason Beavers was laid off was lack of work.  According to Beavers, she asked McCoy how he could lay her off for lack of when there was plenty of work to be done in Amy's department, but McCoy said he was only doing what he had been told.[28]

After Beavers's termination from re-work, Beavers alleges, Shelton stated that he wanted to get 'fresh meat' in the department and within days of Beavers's termination McCoy hired Jennifer Forman ("Forman") in re-work.[29]  According to co-worker Doug Embry, he witnessed Shelton "standing very close to Forman, often with his hand on her shoulder or back in a non professional manner."  *See* Pl. Ex. 2.  Beavers alleges that Forman replaced her on August 16, 2001.  MC denies the source for this information, stating that Beavers was terminated on August 1, 2001 and denying that a "replacement" occurred.[30]

As further proof that the re-work department still had work to do, Beavers alleges, MC "did not wait three (3) days between Beavers leaving and Forman replacing her because contrary to [MC's] lack of work reason, during those few days before Forman arrived, McCoy moved a man named Tallis Swain, who had been working on the column line, over to work in re-works for a few days with Letha Knock and Amy Jordan."  MC admits that Swain filled in but denies a source "for the remainder of the legal argument."

---

[27] MC denies any "supporting or corroborating testimony."

[28] MC denies any "supporting or corroborating testimony."

[29] The evidence shows that Shelton subsequently dated Forman and now has a child with her.  Forman claims that she did not start dating Shelton until March 2002 and was not divorced until June 2002.  McCoy confirmed that Shelton and Forman had a relationship and that the company has no policy against supervisors dating employees.  Forman was laid off from MC in November 2001 and rehired in January 2002.

[30] MC deems "replacement" a mischaracterization, "as Forman was recalled to her prior job in re-work, from which she had been laid off in June 2002, but filled in only occasionally in cap and base when needed."

13

Shelton testified that Beavers was laid off because she had less seniority than other employees. However, Forman appears to have had less seniority than Beavers; Forman was originally hired on May 16, 2001, laid off on June 18, 2001, and rehired on August 16, 2001. Beavers contends that, upon Forman's rehiring, she worked not only in re-work but also in cap and base (Beavers's former department).[31] Beavers notes that Shelton admitted an intention to train Forman in cap and base, but MC only agrees that Forman's training was intended to allow her to be a floater in the cap and base department. McCoy confirmed that Forman worked as a floater in both re-work and cap and base when she was hired in August 2001. McCoy later testified that Forman first worked in cap and base but was recalled to re-work after Beavers left.

Additionally, Beavers notes, MC hired the following employees in the cap and base and re-work departments after Beavers's layoff: Rebecca Castleberry, Kim Buchanan, Tony Daniels, Guatalupa, Jennifer Moore, and Sharon Thomas.[32] Beavers also points to Shelton's testimony that he did not recommend recalling Beavers because she became hostile towards him when she learned he was being laid off. MC denies the relevance of this statement since Shelton lacked hiring authority.

Other layoffs occurred around the time of Beavers's layoff. A group of employees who had been hired for a soon-to-be-started night shift were laid off when a night shift was not immediately started. When the night shift did start in May or June it only lasted two to three months. After the September 11, 2001 attacks, MC made another workforce cutback.

---

[31] Millcast again denies the source of this evidence.

[32] MC objects to this evidence as irrelevant since plaintiff has provided no evidence that these employees did Beavers's exact job at times relevant to this action.

**B. Evidence Purporting to Create a Reasonable Inference that MC's "Job Performance" Reason for Terminating Plaintiff is Not Legitimate and the Real Reason Is Retaliation**

McCoy signed a layoff form for Beavers on August 13, 2001 that stated "slow work habits, talked with her several times regarding: long breaks & sell Avon during work and tardy several times" as additional reasons for the layoff. McCoy later testified that he did not know why Leverton wrote these additional reasons on the layoff form. Leverton testified that McCoy told her to write both lack of work and bad work habits as reasons for the layoff. *See* Pl. Ex. 12 at 10.

McCoy testified that he intended to let Beavers continue to work in re-work after the week of August 6th "[b]ut she did the same thing in re-works as . . . in cap and bases, being late from break, reading the newspaper." If Beavers had done a good job in the re-work department, McCoy testified, he would have allowed her to continue working permanently, but she blew her chances that week and August 10th was her last day. Although he needed help in re-work, McCoy testified, he needed a dependable employee who would not have tardiness and absenteeism problems. McCoy testified that Amy Jordan, the re-work supervisor, informed him that Beavers was not doing what she was supposed to do. According to McCoy, he instructed Amy to let Beavers work until Friday, her last day.

Significantly, Amy Jordan's affidavit directly contradicts McCoy's testimony. Jordan stated:

I never told Randy McCoy or anyone else that Kim Beavers was not doing her duties in re-work; that Kim Beavers was not doing what she is supposed to be doing in re-work; that I did not need Kim Beavers in re-work; that Kim Beavers is not going to work out; that Kim Beavers was late; that Kim Beavers was eating her breakfast; that Kim Beavers was reading the paper; or that Kim Beavers was selling Avon. I never said any of the above statements or anything similar to Randal McCoy or anyone about Kim Beavers. I never said anything negative to Randal McCoy or anyone about Kim Beavers' job performance when she worked in re-work or at any time. When Kim Beavers worked for me that one week in August 2001 in re-work, her work was fine, and I did not complain to

15

anyone about her.

*See* Pl. Ex. 3.

Beavers's time records from August 6th through August 10th in re-works reflect no tardiness. McCoy confirmed that he had no issues with the manner in which Beavers performed her work; rather, he had problems with her lateness, reading newspapers, and being absent without letting anyone know. Shelton similarly stated that he did not have a problem with how Beavers did her job but did have to verbally reprimand Beavers about tardiness and selling Avon.

In a joint statement dated August 7, 2001, McCoy and Shelton state that the meeting on August 6, 2001 was to discuss the fact that Beavers had been taking long breaks, selling Avon, and reading the newspaper during work hours. Shelton also signed a subsequent statement on December 5, 2001 saying the same thing. However, contrary to these signed statements, McCoy and Shelton both testified that the August 6, 2001 meeting was called to clear up whether Beavers had asked to be laid off or not. According to Beavers, she never discussed with Shelton or McCoy job performance issues or whether she read the newspaper, sold Avon, and took long breaks during work. MC denies any "supporting or corroborating testimony" from sources other than Beavers. Beavers further alleges that she did not come back late from breaks or read non-work-related materials while on the clock, which MC also denies based on a lack of corroborating or supporting . evidence.[33]

Regarding morning tardiness, Beavers says that Shelton gave her permission to occasionally

---

[33] Other MC employees have testified about Beavers's work habits. Ms. Jordan, who is McCoy's sister and a current employee in cap and base, testified that Beavers ate breakfast before work, came in late, and read books, newspapers, and magazines during work. Ms. Waine, also a current employee in caps and base, testified that she never saw Beavers reading books, magazines, and newspapers at work, but did see her eating breakfast at her workstation.

come in late in the morning because of a special babysitting issue.  MC denies a source for this evidence and notes that Beavers's "occasional" lateness manifested itself fourteen times from May 27, 2001, to August 5, 2001.  Beavers points out that Shelton has allowed both Forman (Beavers's replacement) and an employee named Kim Buchanan to arrive late due to daycare schedules.[34]  MC admits that these employees received special permission to work alternate schedules because of child care but denies that plaintiff received similar permission; rather, according to MC, plaintiff "came in whenever she pleased."  Beavers draws the court's attention to Forman's time records from August 2002 until November 2002, which reflect that Forman was late to work every day except one for eleven weeks, without receiving discipline.  MC objects to the relevance of time records a year after plaintiff's layoff.[35]

Regarding Avon sales, Beavers admits that she brought an Avon book to work, put it on the breakroom table, and allowed employees to purchase products from her.  Beavers further alleges no one chastised her for this behavior; MC denies any "supporting or corroborating testimony" for this allegation.  Regarding breakfast on the clock, Beavers alleges that she only ate breakfast before work or during the morning break.[36]  MC denies any "supporting or corroborating testimony" for this allegation.

Contrary to MC's EEOC position statement that "Mr. McCoy had indeed counseled and warned Ms. Beavers about her ongoing tardiness and work performance issues [as] noted in the June

---

[34] Ms. Waine further testified that she saw Forman and another employee come in late.

[35] Forman was scheduled to work from 6:00 a.m. to 3:00 p.m. (Beavers's same shift).  Leverton testified that she was not aware of any reason Forman would be entitled to come into work late every day in August or September 2001.  *See* Pl. Ex. 12 at 53.  The evidence of post-layoff tardiness would likely be admissible.

[36] MC employees are permitted a morning and lunch break.

18 warning notice form," McCoy later admitted this part of the EEOC statement was incorrect. Although the June 18, 2001 write-up of Beavers mentions McCoy, McCoy testified that he did not discuss Beavers with anyone in June 2001, since at that time he supervised a different department – the mold department. Beavers contends that she neither saw the June 18[th] write-up nor was told about it, which MC denies based on lack of corroboration. When asked about this write-up, Shelton could neither explain why it referenced a discussion with McCoy nor remember the  handwritten portions referencing McCoy being on the write-up when he signed it.[37]

### C. Evidence Purporting to Create a Reasonable Inference that MC's Reason for Not Transferring Plaintiff to the Production Line is Not Legitimate and Is An Illegal Discriminatory Reason

Since Beavers left MC, employees working on the line have left and new people have been hired to work on the line. Beavers contends that the reason she was not put on the line is because McCoy does not think women could lift the heavy tops. MC denies a source for this evidence; no evidence indicates that Beavers ever requested a transfer to the production line. Beavers further asserts that female employees at MC only work in two departments: re-work and cap and base; MC highlights McCoy's testimony that women are generally working in re-work and cap and base. (Emphasis added).

According to Beavers, a day after she was terminated MC hired Carlos Nobles to work on the column line and a month after she was terminated MC hired Quencezola M. Splunge.[38]  MC denies sources for this evidence, citing plaintiff's termination date as August 1, 2001. On August 15, 2001, MC hired Robbie Bedford to work in Column Boxing.

---

[37] Leverton was responsible for the handwritten portion of the June 18th write-up at issue and testified that McCoy provided the information.

[38] This court notes that it is not clear to which MC department Ms. Splunge was assigned.

### III.   CLAIM THREE: NEGLIGENT AND/OR WANTON HIRING, SUPERVISION, TRAINING, AND/OR RETENTION

Plant Manager McCoy was never trained on the subject of sexual harassment and has never trained any other employee on this topic. Beavers alleges that McCoy did not investigate Beavers's complaint of sexual harassment. In response, MC alleges that Beavers's own evidence indicates McCoy spoke with both Beavers and Shelton about the sexual harassment allegations. Furthermore, MC alleges, "discussion with anyone else would have been utterly futile given that plaintiff has not been able to identify a single witness that claims to have witnessed [the sexual harassment] . . . . Plaintiff has failed to suggest or present any evidence that McCoy could have taken any productive steps under the circumstances that he did not take."[39]

While eating lunch on company property, McCoy testified, male employees sat around with McCoy and talked about having sex with Beavers for money.[40] McCoy testified that he neither talked to the men about what they were saying (there were no women around), *see* Pl. Ex. 9 at 262, nor talked to Beavers about it (since McCoy minded his own business). *See* Pl. Ex. 9 at 142-145.

According to Beavers, MC did nothing to verify that Beavers had recanted her allegations of sexual harassment to McCoy. MC counters that Leverton, through a conversation with McCoy, verified that Beavers had recanted. Beavers then emphasizes McCoy's deposition testimony"You know how women are" (in regard to Beavers "yapping" about Shelton) as evidence of McCoy's complete lack of training on sexual harassment. MC issued no document to employees listing

---

[39] This court provides a relevant excerpt from McCoy's deposition: "Q: *Did you investigate Ms. Beavers's complaint of sexual harassment?* A: 'No.'" *See* Pl. Ex. 9 at 99. MC's arguments with regard to lack of corroboration may have their only significance here.

[40] Specifically, McCoy testified that James Knight said he gave Beavers one hundred dollars to have sex, Doug Embry said he paid Beavers some amount to have sex, and Bryan Green said he had sex with Beavers.

alternatives to reporting sexual harassment claims to their supervisor (Shelton) or plant manager (McCoy).[41]

After Beavers's termination, Beavers alleges, Shelton stated that he wanted "fresh meat" in the department and Forman began working for him a few days later. Subsequently Shelton dated Forman, impregnated her, and allowed her to constantly arrive late at work.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence

---

[41] While the parties' briefs neither refer to nor cite a MC employment manual, plaintiff's exhibit 9 contains a MillCast Employee Handbook allegedly signed by Beavers on September 14, 2000. That handbook provides:

> Employee complaints of sexual harassment may be made either through the company's regular complaint procedure or directly to the plant manager. All such complaints shall receive the immediate attention of the officer receiving them. Any company official receiving a complaint of sexual harassment shall interview the complainant and investigate the complaint fully. Such an investigation shall include conferring with all parties and witnesses named by the complainant.

'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. CLAIM ONE: HOSTILE WORK ENVIRONMENT - SEXUAL HARASSMENT

#### A. **Plaintiff's Position**

The evidence proves that Shelton subjected her to a sexually hostile work environment.

#### B. **Defendant's Response**

MC contends that Beavers's hostile work environment claim fails because Shelton's conduct was not sufficiently severe or pervasive under Eleventh Circuit case law.  Also, MC argues, Beavers did not subjectively perceive her work environment to be abusive.

On July 24, 2001, MC contends, Beavers was not subjected to a sexually hostile work environment, because Shelton only asked Beavers to take a vacation day with him.  As Beavers

admitted in her deposition, "[Mr. Shelton] didn't say anything about his penis or about sex that day" or any day before July 24, 2001.  Notably, MC asserts, Beavers "didn't know what [Shelton] meant" when he asked her to take a day off with him and thus could not have construed Shelton's request as sexual.  Regarding the other alleged incidents of sexual harassment, MC alleges there is undisputed evidence that Mr. Shelton never touched Beavers, Beavers was free to walk away from Shelton at any time, Beavers never felt threatened by Shelton's remarks, and Beavers was able to do her job in the same manner and according to the same standards as before Shelton's remarks.  Finally, MC alleges, Beavers did not report the alleged harassment until after she was notified of her termination.

The "totality of circumstances" test set out in *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993), MC argues, must be applied to Beavers's hostile work environment claim.  To be legally actionable, the sexually harassing conduct must be sufficiently serious to affect the plaintiff's terms, conditions, and privileges of employment.  Pursuant to *Harris,* a lower court should consider "all the circumstances, [which may include] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *See Harris,* 510 U.S. at 23; *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir. 1999)(citations omitted).  Most importantly, MC argues, "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris* at 22.

MC observes that the *Mendoza* court, on facts similar to those here, found that the defendant's conduct was not sufficiently severe or pervasive to alter the terms and conditions of

22

the plaintiff's employment. *See Mendoza* at 1247 (alleging that the harasser said "I'm getting fired up," rubbed his hip against plaintiff's hip while touching her shoulder and smiling, sniffed at plaintiff while glancing at her groin, constantly followed plaintiff, and stared at her in a "very obvious fashion.")[42]  MC then lists other cases (all cited in *Mendoza*) in which defendant's conduct was found insufficient under the *Harris* test. *See, e.g., Shepherd v. Comptroller of Public Accounts of Texas*, 168 F.3d 871, 872-75 (5th Cir. 1999); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998); *Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1167-68 (7th Cir. 1996); *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753-54 (4th Cir. 1996).

Furthermore, MC argues, Beavers's claims do not pass the *Harris* test since there is no evidence she subjectively perceived her environment to be abusive or that Shelton's comments altered the terms and conditions of her employment.  According to MC, Beavers testified that Shelton never threatened her in any way, *see* Def. Ex. 1 at 190, and that she was "able to do [her] job in the same manner and according to the same standards [she] had been doing it the whole time [she] worked there." *Id.* at 204.  Furthermore, MC notes, if Beavers had found Shelton's comments abusive, she could have reported them to McCoy, a fellow African-American, any time from July 26 through August 1.  Instead, MC contends, Beavers waited until notification of

---

[42] Determining that no hostile work environment existed, the *Mendoza* court stated:

> Mendoza did not endure conduct that was so severe or pervasive that it altered the terms and conditions of her employment.  Three of the four factors – physically threatening or humiliating conduct, interference with job performance, and severity – are clearly absent . . . . The other factor – frequency of the harassing conduct – is also for the most part lacking, but to the extent Mendoza showed frequent conduct, the frequency of it does not compensate for the absence of the other factors.

*Id.* at 1248.

her termination to make such a report.

### C. Plaintiff's Reply

Beavers contends that the July 24, 2001 incident should be viewed in light of the "totality of the circumstances" as a "building block upon which Beavers's sexually hostile work environment claim is based." Beavers then states: "Morever, the entire testimony referenced by MC shows that Beavers was sexually harassed." Here, Beavers repeats her testimony that Shelton said he "wanted to make love to me and stick his thing in me." Def. Ex. 1 at 149. [43]

Next, Beavers contends, MC misrepresented how Shelton "simply walked away" after her rejections on July 26th, July 31st, and August 1st. Beavers notes that Shelton's requests were far from polite and that he returned to Beavers's work station on August 1, 2001 after she rejected him. Beavers also objects to MC's characterization that Beavers was free to walk away from Shelton at any moment.[44] Additionally, Beavers objects to MC's statement that "Plaintiff never felt threatened by Shelton's remarks." Rather than testify to her feelings, Beavers notes, she simply replied "No" to the question "Did he ever threaten you in any way?" Similarly, Beavers calls the statement "Mr. Shelton's alleged statements never prevented plaintiff from

---

[43] This court again notes that, in Beavers's deposition, she first indicates Shelton mentioned sex on July 24, 2001, *see* Def. Ex. 1 at 147-48, but later indicates that Shelton first referenced sex and his penis later in the week. *See* Def. Ex. 1 at 155.

[44] The evidence reads:
Q: *When he was saying these things to you, there was nothing that prevented you from walking away from him, was there?*
A: No, there was nothing preventing him from walking away.
Q: *He didn't trap you up against anything or imprison you in any way, did he?*
A: He was standing so close to me next to my ear I could feel him breathing on my face.
Q: *Did he trap you in there so you couldn't walk away?*
A: No
Q: *All right. You weren't tied to a piece of machinery in any way, were you?*
A: No.
*See* Def. Ex. 1 at 174-175.

doing her job in the same manner and to the same standards she had always performed her job in the past" another "self-serving paraphrasing of evidence." Alleging that MC completely mischaracterized the evidence, Beavers cites from her deposition:

> A: I didn't perform my job as a sander, no. I was moved to another department.
> Q: *All right. You were moved to a different department on Monday the 6th; right?*
> A: Correct.
> Q: *And that was three work days after Ken Shelton had told you that you were going to be laid off; right?*
> A: Approximately.
> Q: *Okay. You did your work as a sander through August the 3rd; is that right?*
> A: Correct.
> Q: *Were you able to do your job in the same manner and according to the same standards you had been doing it the whole time you worked there?*
> A: Yes.

*See* Def. Ex. 1 at 204. According to Beavers, the cited testimony reflects that when Beavers was moved to a different department, away from Shelton, she was able to do her job. As further proof that her job was affected, Beavers contends, she told McCoy she could not work with Shelton after McCoy told her she needed to get along with him. *See* Def. Ex. 1 at 211.

Beavers repeats the sexual remarks that Shelton allegedly made to her as evidence that the conduct was sufficiently severe or pervasive to constitute a sexually hostile work environment. Unlike *Mendoza*, Beavers argues, her sexually hostile environment along with her termination occurred within weeks at the most, while the events enumerated in *Mendoza* occurred over an eleven-month period.[45] Unlike the supervisor in *Mendoza*, Beavers contends, Shelton used vulgar language. Beavers repeats that she told McCoy that she could not work with Shelton and says that while she said Shelton did not threaten her, she was never asked whether she felt threatened.

---

[45] This fact likely makes the harassment claim less sufficient, not more.

25

## II.    CLAIM TWO: RETALIATION

### A. Plaintiff's Position

As the evidence shows, MC terminated her in retaliation for her report of sexual harassment. The evidence creates a reasonable inference that 1) MC moved Beavers to the re-work department in an attempt to separate her from her harassing supervisor, Shelton;[46] 2) MC's "lack of work" and "job performance" articulated reasons for terminating her are pretexts for intentional discrimination; and 3) MC's articulated reason for not putting Beavers on the line is also pretextual.

### B. Defendant's Response

Beavers cannot establish a *prima facie* case of retaliation because there is no causal relationship between her transfer and report of harassment. Beavers was informed by Shelton, her supervisor, of her termination on August 1, 2001. Specifically, plaintiff's opposition to MC's motion to dismiss states: "On August 1, 2001, Shelton continued to sexually harass Beavers and when she rejected him, he took a tangible employment action against her by laying her off." Beavers claims that she first reported Shelton's conduct to McCoy on August 2, 2001. *See* Def. Ex. 1 at 193-196. According to MC, Beavers has admitted that there is no reason MC should have know of Mr. Shelton's alleged conduct before August 2, 2001. *See* Def. Ex. at 254. MC contends: "There is no evidence whatsoever that Beavers reported sexual harassment or otherwise engaged in protected conduct before the moment at which she informed Mr. McCoy of Mr. Shelton's alleged statements."

---

[46] To the extent, if any, that plaintiff claims this act was retaliatory, the court concludes that it was remedial, not retaliatory.

26

Notably, MC argues, "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression before it took adverse employment action." *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1354 (11th Cir. 1999)(citations omitted). Here, MC could not have been aware of Beavers's report of sexual harassment because MC decided to terminate Beavers before she ever reported the alleged harassment. Therefore, MC contends, this lack of a causal connection entitles MC to summary judgment on Beavers's retaliation claim.

### C. **Plaintiff's Reply**[47]

Beavers repeats McCoy's testimony that he had intended keep Beavers in re-work if she had done a good job. Beavers adds: "MC fails to realize . . . [that] Shelton . . . took a tangible employment action against Beavers, but it is McCoy who retaliated against her immediately after she complained." Beavers again notes that McCoy signed layoff forms for her dated August 13, 2001. *See* Pl. Ex. 9. Beavers repeats evidence regarding Forman's hiring three days after her August 13, 2001 termination.

Regarding MC's allegations of tardiness, Beavers states: "The key factor is that Shelton gave [me] permission to be late." Further, Forman's 2002 time records (demonstrating nearly eleven weeks of tardiness without discipline), Beavers argues, are relevant. Beavers contends that she is not restricted to evidence from the same time period that she suffered an adverse employment action.[48]

---

[47] This court does not further recount all of the evidentiary points made in Beavers's reply, since many of these points have been addressed in the Facts section of this memorandum opinion.

[48] Beavers supports her argument as follows:

It is the rare case indeed in which there is a nearly exact temporal overlap between the alleged

Addressing MC's failure to transfer Beavers to the production line, Beavers quotes

McCoy's deposition: "[W]e just don't have women on the line .... I don't think they could lift

the tops. The tops are heavy." This court observes that neither party has presented evidence that

Beavers requested a transfer to the production line.

Beavers contends that she has demonstrated a causal relationship between her report of

harassment to McCoy and her termination. The parties do not dispute that McCoy testified that

he intended to let Beavers continue in the re-work department, but she displayed poor work

habits and tardiness there. Furthermore, Beavers notes, McCoy testified that if she had done a

good job in re-work he would have kept her, but she blew her chances that week. Thus, Beavers

argues, MC has admitted that when it transferred Beavers to re-work, "she had a job to keep."

Furthermore, Beavers denies that she admitted "that there is no reason MC should have known

of Shelton's alleged conduct before August 2, 2001." Beavers objects to MC's question as

vague and calling for speculation.[49]

Beavers contends that she was retaliated against twice: when she was terminated on

---

discriminatory conduct and the conduct regarding similarly situated individuals. The last date
of the allegedly discriminatory conduct is not a bright line beyond which the conduct of the
employer is no longer relevant in a discrimination case. Otherwise, clearly relevant evidence
would be arbitrarily excluded; for example, a plaintiff in a race discrimination case would then
be precluded from producing evidence that the week after he was fired, a white employee
escaped discipline for the exact same conduct. The focus must remain on whether the evidence
is relevant to demonstrate that discrimination played a role in the decision, and that determination
is not served by a bright line temporal restriction.

*Freeman v. Madison Metro. School Dist.*, 21 F.3d 374, 382 (7th Cir. 2000). This court agrees.

[49] The pertinent portion of Beavers's deposition reads:

Q: *Well, do you know of any reason that the company should have known he was saying those things to*
*you?*

A: No.
MR. GOLDFARB: Object to the form.

August 13th and when she was not rehired.  Beavers maintains that MC's stated reasons for

terminating her on August 13, 2001 – lack of work and Beavers's poor job performance -- are

illegitimate.[50]  Regarding any alleged lack of work, MC replaced Beavers with Forman within

days of her termination.  Even before Forman arrived, Beavers argues, McCoy moved a man

named Tallis Swain over to re-work for a few days with Letha Knock and Amy Jordan.

Regarding any deficient job performance in re-work, Beavers argues, Amy Jordan's affidavit

contradicts McCoy's testimony that Jordan told him Beavers was doing a poor job in re-work.

*See* Pl. Ex. at 3.  Therefore, Beavers alleges, retaliation for her complaints about Shelton's sexual

harassment, rather than poor job performance, motivated MC to terminate her.

Second, Beavers argues, MC further retaliated by refusing to rehire her.  Shelton testified

that he did not recommend recalling Beavers from layoff because "[she] became hostile during

the time that I told her she was laid off.  And I just didn't think that we was going to be able to

have a working relationship anymore."  *See* Pl. Ex. 10 at 102-103.  This "hostility", Beavers

asserts, can only refer to Beavers's statement to McCoy (overheard by Shelton) that she planned

to file sexual harassment claims against Shelton.

## III.   CLAIM THREE: NEGLIGENT AND/OR WANTON HIRING, SUPERVISION, TRAINING, AND/OR RETENTION

### A. Plaintiff's Position

The evidence raises a reasonable inference that MC was negligent and/or wanton in its

hiring, supervision, training, and retention of employees.

---

[50] Beavers repeats the undisputed facts as follows: she reported sexual harassment to McCoy on August 6, 2001 (Beavers has also testified that she reported sexual harassment to McCoy on August 2, 2001, which McCoy denies); McCoy moved her to re-works beginning August 6th and stated in his deposition that he had intended to keep her there; a few days after her sexual harassment complaint to McCoy, McCoy terminated her and signed a layoff sheet on August 13, 2001.

## B. **Defendant's Response**

MC argues that there is no evidence that MC had notice or knowledge of Shelton's alleged sexual harassment at any time prior to its occurring. Furthermore, MC asserts, Beavers has conceded that there is no reason MC should have known of Shelton's alleged conduct before she reported it on August 2, 2001. *See* Def. Ex. 1 at 254. Moreover, MC contends, no similar complaints of sexual harassment have ever been made against Shelton by any other MC employee.[51]

Beavers's state law claim must fail, MC contends, because the Alabama Supreme Court has never recognized causes of action for negligent and/or wanton hiring, training, supervision, and/or retention in the employment discrimination setting. *See Hathorn v. Boise Cascade Corporation*, 1998 U.S. Dist. LEXIS 18113, *24 (S.D. Ala. 1998)(race discrimination case). *Hathorn* stated: "[I]t is unlikely the Alabama Supreme Court would extend the negligent hiring or supervision tort to include employment discrimination claims since the extension would transform routine employment discrimination cases into state law torts and would undermine Alabama's employment-at-will doctrine."

Even if Alabama recognized such causes of action in the employment discrimination setting, MC argues, Beavers' claim fails. Alabama law renders an employer liable for the intentional torts of his agent only when 1) the agent's wrongful acts were done in the line and scope of his employment or in furtherance of the employer's business or (2) the employer participated in, authorized, or ratified the wrongful acts. *Joyner v. AAA Cooper Transp.*, 477 So. 2d 364, 365 (Ala. 1985). *In addition to showing the underlying tortious conduct*, to prove ratification the plaintiff

---

[51] The cited excerpt from Beavers's deposition does not appear to support this contention.

must show that the employer

> (1) had actual knowledge of the tortious conduct of the offending employee and
> that the tortious conduct was directed at and visited upon the complaining employee;
> (2) that based upon this knowledge, the employer knew, or should have known, that
> such conduct constituted sexual harassment and/or a continuing tort; and
> (3) that the employer failed to take adequate steps to remedy the situation.

*Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 825 (Ala. 1999)(emphasis added).

Therefore, MC contends, Beavers must prove that MC participated in, authorized or ratified

Shelton's alleged misconduct.  To do this, Beavers must affirmatively prove that MC had notice or

knowledge of the misconduct[52] prior to the alleged injury to plaintiff.  *See, e.g., Mardis v. Robbins*

*Tire & Rubber Co.*, 669 So.2d 855, 889 (Ala. 1995); *Perkins v. Dean*, 570 So. 2d 1217, 1219-20

(Ala. 199).[53]

MC contends that Beavers did not meet her burden of proof.  According to MC, there is no

evidence MC had the requisite notice or knowledge of the alleged misconduct at any time prior to

Beavers's report to McCoy on August 2, 2001.[54]  MC reiterates that because it lacked knowledge

of Shelton's alleged sexual harassment before such conduct occurred, this court should dismiss

Beavers's state law claims.[55]  Additionally, MC argues, McCoy's alleged retaliation against plaintiff

---

[52] To establish the requisite notice or knowledge, MC contends, Beavers must affirmatively prove that MC actually knew of Shelton's misconduct or could have discovered Shelton's misconduct by means of due and proper diligence.

[53] MC presumes that Shelton's alleged sexual comments to Beavers constitute the alleged "misconduct."

[54] MC repeats the statement: "it is undisputed that no similar complaints of sexual harassment have ever been made against Mr. Shelton by any other employee of MC," citing Def. Ex. 1 at 202. Again, this court finds that MC's cited evidence does not appear to support MC's contention.

[55] MC goes on to address Beavers's depiction of McCoy as negligent for not halting, addressing, or deeming "sexual harassment" an all-male lunchtime conversation about paying Beavers for sex.  MC observes that Mr. McCoy is correct (in not considering these remarks to be sexual harassment) because inappropriate workplace behavior outside an employee's presence is not normally considered part of the "work environment" for purposes of a hostile work environment claim. *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir.

31

would not constitute negligence and/or wantonness on the part of MC, since there is "no evidence whatsoever that MC had knowledge of any of Mr. McCoy's alleged misconduct before it occurred."

### C. Plaintiff's Reply

First, Beavers argues, her counsel's inability to locate witnesses to Shelton's sexually harassing conduct has no bearing on whether McCoy should have investigated Beavers's complaints with other MC employees, e.g., those who may have overheard Shelton's remarks or similarly situated female employees who may also have been sexually harassed. Beavers reiterates that MC did not verify McCoy's statement that Beavers had recanted charges of sexual harassment. *See* Pl. Ex. 12 at 25-26. Turning to MC's allegation that no similar sexual harassment complaints had ever been made against Shelton by another MC employee, Beavers notes (as this court has) that MC's citation does not support MC's allegation.

Beavers relies on two cases – *Machen v. Childersburg Bankcorporation, Inc. and Big B, Inc. v. Cottingham* – to counter MC's claim that the Alabama Supreme Court has never recognized such causes of action in an employment discrimination setting.   In both *Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981 (Ala. 1999)(alleging negligent and/or wanton investigation, training, supervision, and discipline in the sexual harassment context) and *Big B, Inc. v. Cottingham*, 634 So. 2d 999 (Ala. 1993)(alleging that the defendant negligently trained and supervised an assistant store manager, who had allegedly falsely imprisoned and sexually assaulted a female shopper), Beavers argues, the Alabama Supreme Court  Court recognized such causes of action.

Reversing the lower court's grant of summary judgment for defendant, the Alabama Supreme Court in *Machen* held:

_____

1995).

32

> After reviewing the evidence in a light most favorable to Machen, we conclude
> that the evidence creates a genuine issue of material fact as to whether the bank
> defendants (the chief executive office and chief operations officer) took
> adequate steps to investigate Machen's complaint of sexual harassment and
> to train bank employees, including [Machen's supervisor, the alleged harasser]
> regarding the bank's policies prohibiting sexual harassment, and whether they
> took appropriate disciplinary measures to remedy the situation; and, if they did
> not, whether their failure was the result of negligence or wantonness.

*Machen*, 761 So. 2d at 987.

Affirming the lower court's submission of plaintiff's claims to the jury, the Alabama

Supreme Court in *Big B* concluded:

> [T]here was sufficient evidence to show a failure on the part of Vaughn's
> [the assistant manager] supervisors to review the company's training manuals with him
> or to otherwise train him as to the proper manner in which to detain and
> question a suspected shoplifter.  There was also sufficient evidence to allow
> the jury to determine whether Vaughn's supervisors were negligent in failing to
> properly investigate the accusation of sexual harassment made by the mother
> of the female employee [whom Vaughn had allegedly approached sexually].
> . . . The jury could have found that if Vaughn's supervisor had sufficiently
> investigated the incident, Vaughn's attitude toward women and his fitness for
> employment would have been more seriously reevaluated and he would not
> have been allowed to remain in a position where he could mistreat female
> customers or employees.  Thus, we hold that the claim for negligent training
> and supervision was properly submitted to the jury.

*Big B* at 1003-1004.  Similarly addressing plaintiff's wanton training and supervision claim, the *Big

B* court concluded that the jury, when presented with Vaughn's supervisors' failure to interview the

female employee who accused Vaughn of sexual harassment or file a report with corporate

headquarters, "could have reasonable inferred from the evidence that the [supervisors] consciously

chose to downplay the incident in order to retain Vaughn, knowing that to do so would likely give

Vaughn another opportunity to demean or otherwise mistreat a female customer or employee."

Beavers contends that the evidence shows she received no training on the subject of sexual

33

harassment, MC failed to train its managers (Shelton & McCoy) on sexual harassment,[56] MC failed to provide its employees with an effective method of reporting harassment, and MC failed to investigate Beavers's complaints against Shelton.

Finally, Beavers notes, MC's reliance on *Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995) is misplaced. In that case, Beavers argues, the Eleventh Circuit held that the plaintiff could not base a sexual harassment claim on hearsay statements that she did not even learn about until after her termination. Here, Beavers argues, she has not based her sexual harassment claim upon what male employees allegedly said about her during lunch; rather, Beavers contends, this evidence illuminates McCoy's "utter lack of training concerning sexual harassment,

---

[56] Regarding sexual harassment training, Shelton testified:

Q: Did you ever receive training on the subject of sexual harassment?
A: Yes.
Q: What training have you received?
A: We have monthly meetings.
Q: Who conducts them?
A: The supervisor, the plaint supervisor.
Q: And that would be Mr. McCoy?
A: Yes.
Q: And he talks to you about sexual harassment?
A: Yes.
Q: And he explains it to you?
A: Yes.
Q: And he tells you what it is?
A: Yes.
   . . .

Q: What have you been told by anyone about what constitutes sexual harassment?
A: Nothing, other than that it is not allowed, it is not tolerated and things to look out for.
Q: What has Mr. McCoy told you concerning things to look out for?
A: If anyone comes to you with a complaint of sexual harassment that it should be reported immediately.
Q: What else?  What has he told you about what is sexual harassment.
A: I don't know – I don't know if he has so much told me that.  I think – I think his approach was that if anyone come to you witha complaint of sexual harassment that it should be reported.
Q: Have you received any training at the company on what constitutes sexual harassment?
A: Nothing other than reading in the memo, in the handbook. . . .

*See* Pl. Ex. 10 at 19-21.  McCoy testified that he never gave any training to anybody on sexual harassment and nobody every trained him.  *See* Pl. Ex. 9 at 259.

and his failure to take action to stop what any properly trained manager would realize could quickly build into a sexually hostile environment." Beavers repeats that Shelton's sexual comments and tangible employment action of laying her off on August 1, 2001, are the basis for her sexual harassment claim.

## CONCLUSIONS OF THE COURT

### Sexual Harassment

The court first concludes that the evidence submitted is sufficient to create a reasonable inference that Shelton, as plaintiff's supervisor, participated in decisions which had a tangible effect on plaintiff's employment. *Faragher v. Boca Raton*, 524 U.S. 775, 807-808 (1998), is instructive:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise . . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*See Burlington*, 524 U.S., at 762-763. There is substantial evidence that Shelton was involved in a decision to lay plaintiff off and that his role could have been motivated by plaintiff's rejection of his sexually based overtures. The motion will be denied as to this claim.

The court further concludes, however, that there is not sufficient evidence to support a sexual harassment claim based on general hostile environment. Once the alleged sexual harassment was reported to McCoy, he transferred her to another position. There is no substantial evidence that she was thereafter sexually harassed by Shelton or anyone else. The motion will be granted as to any

35

such purported claim.[57]

## Retaliation

Since a preliminary decision to lay off plaintiff had been made, this claim is weak.  In view of the short time lapse between plaintiff's complaint and the <u>ultimate</u> decision to lay her off, however, a retaliation claim as to the termination may be maintainable.  The motion will be denied as to that claim.

Apparently there is no evidence that plaintiff ever worked on the production line or that she requested to be considered for a job on that line.  The motion will be granted as to any purported retaliation claim based on not receiving such a position.[58]

It is not clear whether the plaintiff purports to make a retaliation claim based upon being taken out of Shelton's department and placed in re-work.  If there is such a claim, it is meritless.

## Negligence

Apparently Alabama recognizes a state law claim based upon negligently failing to train or supervise a person (Shelton) with regard to sexually harassing an employee.  There is no substantial evidence, even assuming that plaintiff suffered any injury or damages from Shelton's alleged harassment, that the defendant was on notice of such alleged harassment until the plaintiff reported it to McCoy.[59]  The motion will be granted as to any purported claim based on the alleged negligent

---

[57] In view of *Mendoza*, even the purported underlying basis may not be sufficient.

[58] In any event there is no evidence that failure to place her in such a position was based on retaliation rather than simply a lack of indicated experience or interest.

[59]   *See Portera v. Winn Dixie of Montgomery, Inc.*, 996 F. Supp. 1418, 1438-39 (M.D. Ala. 1998).
Furthermore, the cases relied upon by plaintiff, *Machen v. Childersburg Bancorporation, Inc.*, 761 So.2d 981, 987 (Ala. 2000) and *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1003 (Ala. 1993), both address the notice requirement for negligent training and supervision claims:
> [T]he master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him.  Liability depends upon its being established by

36

and/or wanton failure to train or supervise Shelton.[60]

As to any purported negligence and/or wantonness claim based on McCoy's lack of training or supervision, the motion will be granted. As indicated above, there is no evidence that plaintiff was harassed after she reported Shelton's alleged conduct to McCoy. There is no proximate cause of any injury to plaintiff based upon McCoy's alleged lack of training or supervision.

For similar reasons, the motion will be granted as to any claims of negligent and/or wanton hiring or retention.

---

affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence. This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice . . . .

(citation omitted). *See also Kelley v. Worley*, 29 F. Supp. 2d 1304, 1313 (M.D. Ala. 1998)(finding "the frequency of the acts alleged here [five] is not enough for the corporate Defendants to be charged with constructive notice of [the alleged harasser's] alleged incompetency").

[60] The court also calls attention to discussions in the following cases: *Machen* at 984-987, *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 2000), and *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1319-20 (N.D. Ala. 2002).

37

### Summary

The defendant's motion for summary judgment will be **denied** as to the following claims:

(1) Tangible employment action sexual harassment based on Shelton's involvement in the layoff; and

(2) Retaliation claim as to the ultimate decision of McCoy or others to lay off plaintiff.

As to all other purported claims, the motion will be **granted.**

This _____ day of September 2003.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

38